UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| ELEX L. MURPHY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:20 CV 189 ACL |
| XAVIER CALVILLO, et al., | ) ) ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER**

Plaintiff Elex L. Murphy, an inmate at Southeast Correctional Center ("SECC"), filed this 42 U.S.C. § 1983 action against correctional officers Xavier Calvillo and Caitlin Douglas alleging violations of his constitutional rights. Presently pending before the Court is Defendants' Motion for Summary Judgment. (Doc. 19.) Murphy did not respond to Defendants' Motion for Summary Judgment, and the time for doing so has expired.

**I.    Background**

In his Complaint, Murphy alleges that he was subjected to excessive force by Defendants in December of 2019, during his incarceration at SECC. (Doc. 6 at 3-6.) He claims that Douglas was escorting the nurse on her evening medication pass and she refused to provide Murphy his medication because he was asleep. Murphy states that he called after the nurse and Douglas to return to his cell when he was awakened, but they ignored him. He states that he began kicking his cell door, requesting to see a sergeant. Calvillo responded to Murphy and told him he would see what he could do about getting him his medication. Murphy states that, when Calvillo returned, he told Murphy that he would not be getting his medication. He states that he asked to speak to the lieutenant, but his request was denied. Murphy admits that he then covered his cell window.

1

When Douglas knocked at Murphy's cell door later for a "soap and tissue pass," the cell window was covered and Murphy did not respond. Calvillo returned to Murphy's cell and called in a "Code 16." Murphy claims this should only be called in when an inmate is medically unresponsive inside his cell. When Calvillo and the other officers came into his cell, he was standing by the sink and asked, "Why are you coming in my cell?" Murphy states that Calvillo had his can of pepper spray out at that time, and gave a verbal directive to Murphy to submit to restraints. He alleges that Calvillo then deployed his pepper spray. Murphy claims that he was on the ground "fully restrained," when Douglas deployed another round of mace in his face.

Murphy alleges that he sustained a small burn to the left of one of his eyes, and a cut to one of his wrists. He states that he was denied mental health treatment when he was going to hang himself. Murphy alleges that he had difficulty breathing and his left eye was burning after he was fully restrained, but he was denied requested medical treatment. A nurse came to see him after two hours, but did not provide treatment for the injuries sustained from the mace. Murphy requests compensatory and punitive damages.

In its review for frivolity pursuant to 28 U.S.C. § 1915, the Court found that Murphy failed to state a plausible claim for deliberate indifference to medical care. (Doc. 8.) Murphy's individual capacity claims against Calvillo and Douglas for excessive force remain.

In their Motion for Summary Judgment, Defendants first argue that Murphy failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act with regard to his claims against Douglas. Defendants next argue that Murphy cannot establish an Eighth Amendment excessive force claim because the facts show that Defendants utilized force in good faith. Finally, Defendants contend that they are entitled to qualified immunity.

Murphy did not respond to Defendants' Motion for Summary Judgment, and the time for doing so has expired.

Defendants have also filed a Reply, in which they state that they mailed a courtesy copy of a DVD containing security footage of the incident to Murphy for his review on the same day they filed their Motion for Summary Judgment. (Doc. 21.) Defendants attached the Affidavit of Plaintiff Elex Murphy, dated March 1, 2022, in which Murphy states that the video footage was made available to him and that he reviewed it. (Doc. 21-1.)

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party, but only if there is a "genuine" dispute as to those facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Mere "metaphysical doubt as to the material facts" is insufficient to defeat summary judgment. *Id.* A party asserting that a fact is genuinely disputed must support the assertion by citing to particular parts of materials in the record. Fed. R. Civ. P. 56(c).

In reviewing the record, a court must not weigh evidence at the summary judgment stage but instead should decide simply whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Scott*, 550 U.S. at 380. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Thus, accurate videos of events in question can allow a court to determine how events transpired

without weighing evidence. *See White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017) (noting that given "video and audio evidence" in the case, the court "need not accept [a party's] version of the facts").

Murphy did not respond to Defendants' Statement of Undisputed Material Facts (Doc. 20-1), as required under Federal Rule of Civil Procedure ("FRCP") 56 and Local Rule 4.01(E). Murphy's status as a *pro se* litigant does not excuse him from responding to Defendants' Motion "with specific factual support for his claims to avoid summary judgment," or from complying with local rules. *Beck v. Skon*, 253 F.3d 330, 333 (8th Cir. 2001). With his failure to respond, Murphy is deemed to have admitted all of the facts in Defendants' statement of uncontroverted facts. *Turner v. Shinseki*, No. 4:08-CV-1910 CAS, 2010 WL 2555114, at *2 (E.D. Mo. Jun. 22, 2010) (citing *Deichmann v. Boeing Co.*, 36 F. Supp.2d 1166, 1168 (E.D. Mo. 1999), *aff'd* 232 F.3d 907 (8th Cir. 2000), *cert. denied*, 531 U.S. 877). Summary judgment is not granted in favor of Defendants as a result of Murphy's failure to properly respond to Defendants' statement of material facts. Instead, the Court deems the facts set forth by Defendants as true. *Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 579 (8th Cir. 2006). Defendants must still establish that they are entitled to judgment as a matter of law. *See id.*

### III.  Facts[1]

In December 2019, Defendant Calvillo was employed as a Sergeant Corrections Officer at SECC. Defendant Douglas was employed as a Corrections Officer at SECC.

Murphy was known to cause numerous daily problems at SECC, including declaring that he was suicidal, faking medical emergencies, covering up his cell window, holding his food slot,

---

[1] The Court's recitation of the facts is taken from Defendants' Statement of Uncontroverted Material Facts. (Doc. 20-1.)

4

popping sprinklers, flooding his cell, and refusing to follow orders to get attention.  Murphy has known anger issues, which would cause him to snap from calm to violent with other inmates and SECC staff.  He has hypertension and an enlarged heart, which causes him to black out occasionally.  Murphy's medical issues have previously left him unable to respond when correctional officers ("CO"s) check on him.  Murphy had been disciplined for covering up his cell window prior to 2019.  He had also been prepper sprayed by COs prior to 2019, and knew that pepper spray would be deployed if he refused to obey orders to submit to restraints.

On December 22, 2019, Murphy was held in Housing Unit 1, part of administrative segregation, as a result of repeated conduct violations.  Calvillo was working as administrative segregation relief sergeant, where he was responsible for overseeing staff, overseeing daily activities, and addressing offender problems and complaints.  Douglas was working as a yard officer, and was part of the "A-Team" response team.

A CO was escorting a nurse on the nightly distribution of medication to inmates in Housing Unit 1, when Murphy began cursing at the nurse from inside his cell.  After Murphy continued to curse at the nurse, she determined that he was refusing his medication.  Murphy became angry, shouting and swearing, and yelled that he was going to cover his windows and there would be a use of force.  Calvillo went to Murphy's cell and tried to deescalate the situation.  He pointed out that Murphy had refused his medication with his behavior, but indicated that he would try to get the nurse to come back when she finished her rounds.  Murphy settled down and removed the cover from his window.  When Calvillo returned, the cover was back up and Calvillo could not get a response from Murphy or see into his cell.  Calvillo called a Code 16 medical emergency to ensure his safety.  Due to an excessive number of fake Code 16

emergencies at the time, there was a verbal directive to always call for A-Team to assist when entering an offender's cell.

At approximately 9:24 p.m., Douglas and the other three COs in A-Team arrived outside Murphy's cell and Calvillo ordered the cell door opened remotely.  As the cell door opened, a covering fell off of Murphy's cell window.  The three COs entered Murphy's cell, taking positions behind and to his side, leaving Calvillo and Douglas as the only COs in the cell door.  Murphy was standing in his cell and immediately began arguing with the officers that this was not a Code 16 and they could not be in his cell.  Calvillo ordered Murphy to turn around to the back of his cell or the side wall and submit to restraints multiple times.  Murphy heard Calvillo order him to turn around and submit to restraints, but he refused to comply.

Calvillo deployed pepper spray on Murphy's face in an attempt to allow the officers to restrain him.  As Calvillo's pepper spray was on a cone setting, it produced a mist that struck Murphy and the three other COs positioned around him, impairing their ability to assist.  Murphy immediately charged Calvillo, repeatedly striking and punching him in the face and head, and knocking him back into the hallway.  Murphy attempted to put Calvillo into a headlock, but he managed to prevent this by raising his arms in a defensive stance.  Murphy's assault continued into the hallway and knocked Calvillo to the ground.  Douglas called a 10-5 code—officer needs assistance—on her radio, calling for backup.  The other three COs attempted to help restrain Murphy, knocking him to the ground, but they were hampered by the pepper spray.  Calvillo, concussed and injured but no longer under assault, attempted to help restrain the still struggling Murphy.

As Murphy continued to resist and every other CO present was incapacitated in some form, Douglas applied another burst of pepper spray to  Murphy's face.  Murphy immediately

6

ceased struggling and allowed himself to be restrained.  Additional COs arrived and relieved Calvillo and A-Team, taking Murphy to flush his eyes and face at a spray station.

At approximately 9:30 p.m., a nurse examined Murphy, who indicated that his eyes were burning and prevented a more thorough assessment by yelling and cursing at the nurse.

Murphy filed an Informal Resolution Request, an Offender Grievance, and an Offender Grievance Appeal related to the use of force, arguing that the Code 16 was improper and that Calvillo used pepper spray on him.

As a result of Murphy's attack, Calvillo required spinal surgery, and has ongoing physical and mental issues that will permanently prevent him from working as a CO.

**IV.     Discussion**

**A. Exhaustion**

Defendants first argue that Douglas is entitled to summary judgment, because Murphy failed to exhaust his claim against her.

The Prison Litigation Reform Act ("PLRA") requires prisoners to exhaust their administrative remedies before filing a § 1983 action: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The purposes of the exhaustion requirement include "allowing a prison to address complaints about the program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record."  *Jones v. Bock*, 549 U.S. 199, 219 (2007).  The PLRA's exhaustion requirement is "mandatory."  *Woodford v. Ngo,* 548 U.S. 81, 85 (2006); *Bock*, 549 U.S. 199, 219 (2007).

7

For a Missouri prisoner to satisfy the exhaustion requirement, he must avail himself of the administrative grievance process established by the MDOC:

> To initiate this process, an inmate must file an Informal Resolution Request ("IRR") within fifteen days of the date of the incident giving rise to the IRR. If the inmate is dissatisfied with the response to his IRR, he can file an Offender Grievance within seven working days of receiving the response. If the inmate is dissatisfied with the response to his Grievance, he can file a Grievance Appeal within seven days of receiving that response. The failure to file timely appeal will result in the appeal being considered abandoned. Only after the inmate receives a response to his Appeal is the administrative grievance procedure exhausted (emphasis added).

*Wewerka v. Roper*, 2010 WL 4628093, at *2 (E.D. Mo. Nov. 8, 2010). In other words, "[f]or a Missouri prisoner to exhaust all administrative remedies, he must file: (i) an informal resolution request ("IRR"); (ii) a grievance; and (iii) a grievance appeal." *Perry v. Figge*, 2014 WL 2818666, at *3 (E.D. Mo. June 23, 2014). Filing an IRR is "[t]he first attempt to resolve an offender's complaint through discussion between the offender and the appropriate staff with documentation of this attempt." *Toney v. Hakala*, 2012 WL 1185028, at *2 (E.D. Mo. Apr. 9, 2012). "Each IRR is limited to one grievable issue and should not be expanded to include other issues at any stage of the review process." *Id.*

Here, Defendants acknowledge that Murphy completed each step of the grievance process before filing this action. At each point of the process, however, Murphy argued only that Calvillo's use of a Code 16 medical emergency was improper, and that Calvillo used pepper spray on him. (Doc. 20-2 at p. 2-8.) Murphy made some references to Douglas being present, but never claimed that she used pepper spray or any other kind of force on him on December 22, 2019. Thus, Murphy's claim in this action that Defendant Douglas applied excessive force is not exhausted and will be dismissed.

8

**B.   Eighth Amendment Claim**

Defendants next argue that the undisputed facts reveal that Defendants used force in good faith.  As such, they contend that Murphy's Eighth Amendment excessive force claim fails on its merits.

The Eighth Amendment protects incarcerated prisoners from "cruel and unusual punishment" by forbidding the "unnecessary and wanton infliction of pain" at the hands of corrections officers.  U.S. Const. Amend. VIII; *Whitley v. Albers*, 475 U.S. 312, 319 (1986); *see also Hudson v. McMillian*, 503 U.S. 1, 5 (1992).  The "core judicial inquiry" for an excessive force claim is whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *See Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 6-7.  "Resolution of the constitutional issue turns on the circumstances of the individual case."  *Treats v. Morgan*, 308 F.3d 868, 872 (8th Cir. 2002).  "The test is whether the officer's use of force was reasonable under the circumstances, or whether it was punitive, arbitrary, and malicious."  *Id.* at 873.  Relevant factors include the need for force, the relationship between the need and the amount of force used, and the extent of injury inflicted.  *See, e.g.*, *Whitley*, 475 U.S. at 321; *Treats*, 308 F.3d at 872.

To establish a claim for the excessive use of force, plaintiff must demonstrate that the force was used maliciously and sadistically to cause harm, rather than in a good faith effort to maintain or restore discipline.  *See Hudson*, 503 U.S. at 6-7.

The Court has reviewed the entirety of the surveillance video footage.  (Def's Ex. F.) The images on the video are clear and the video contains sound.  The footage begins when Calvillo, Douglas, and the three A-Team officers arrived outside Murphy's cell.  As soon as the officers entered Murphy's cell, Murphy became combative, yelling at the officers.  Calvillo can

9

be heard ordering Murphy to turn around and submit to restraints on at least three different occasions.  After Murphy refused to obey Calvillo's orders each time and remained combative, Calvillo deployed the mace.  Immediately after the mace was deployed, Murphy attacked Calvillo, knocking him into the hallway.  The officers are visibly impaired by the mace that was inadvertently sprayed in their eyes, as they struggle to restrain Murphy.  The officers are able to restrain Murphy only after Douglas deployed her mace.  The entire incident lasted less than a minute, after which Murphy is taken by officers to flush his eyes and face.

The video footage depicts the use of reasonable force by Defendants to de-escalate Murphy's combative behavior.  Calvillo deployed his pepper spray when Murphy was yelling and cursing at officers, and refusing to comply with multiple orders to submit to restraints.  Murphy admitted during his deposition that he was never going to turn around and allow Calvillo to cuff him. (Doc.  20-5 at 15.)  Calvillo deployed the pepper spray on Murphy's face to restore discipline and ensure compliance.

Douglas applied another burst of pepper spray to de-escalate Murphy's violent behavior of repeatedly striking and punching Calvillo in the face and head, knocking Calvillo back into the hallway, attempting to put Calvillo into a headlock, and knocking Calvillo to the ground.  Contrary to Murphy's allegation, the video reveals that Murphy was not restrained and was still struggling with officers when Douglas deployed her mace.  Thus, Douglas' use of pepper spray was reasonable and necessary to restore discipline and ensure compliance.

There is no indication in the record that either usage of force was excessive.  The officers used only the amount of force necessary to obtain Murphy's compliance with their directives.  Murphy's eyes and face were flushed just two minutes after the incident, and he saw a nurse minutes after that.  The nurse noted that Murphy's only complaint was that his eyes were

burning.  (Doc. 20-6 at 28.)  Calvillo, on the other hand, had to undergo major surgery due to Murphy's assault and suffers from permanent injuries.

Because there is no evidence that the use of pepper spray was malicious or sadistic, the Court will grant summary judgment to Defendants on Murphy's excessive force claim.

Defendants also argue that they are entitled to qualified immunity.  Having found that Defendants are entitled to summary judgment on the merits of Murphy's claims, it is unnecessary to determine whether qualified immunity also applies.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. 19) is **granted**.  A separate Judgment in favor of Defendants will accompany this Memorandum and Order.

*s/Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 2nd day of August, 2022.